**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND, INC., <br><br> and <br><br> JAMAL MAZRUI, <br><br>       Plaintiffs, <br><br>    v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, <br><br> and <br><br> KATHLEEN MCGETTIGAN,[1] <br> ACTING DIRECTOR, <br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, <br><br> and <br><br> THE BLUE CROSS BLUE SHIELD ASSOCIATION, <br><br>      Defendants. | Case No.: 1:19-cv-06249 <br><br><br> Hon. Sharon Johnson Coleman |

**PLAINTIFFS' OPPOSITION TO
DEFENDANT BLUE CROSS BLUE SHIELD ASSOCIATION'S MOTION TO DISMISS**

---

[1] On January 20, 2021, President Biden named Kathleen McGettigan Acting Director of the Office of Personnel Management. *See McGettigan to Once Again Take Up Temporary Personnel Leadership* (Jan. 20, 2021), https://www.federaltimes.com/management/leadership/2021/01/21/mcgettigan-to-once-again-take-up-temporary-personnel-leadership/. Accordingly, under Federal Rule of Civil Procedure 25(d), McGettigan in her official capacity is automatically substituted for Michael Rigas.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

FACTS ........................................................................................................................ 2

LEGAL STANDARD ................................................................................................. 3

ARGUMENT .............................................................................................................. 4

I.   THE FEDERAL EMPLOYEE HEALTH BENEFITS ACT DOES NOT BAR
     PLAINTIFFS' FEDERAL AND STATE LAW CLAIMS AGAINST BCBSA. ............... 4

II.  THE FEHBA DOES NOT PREEMPT PLAINTIFFS' WASHINGTON LAW
     AGAINST DISCRIMINATION CLAIM. ............................................................. 8

III. SECTION 504 OF THE REHABILITATION ACT APPLIES TO BCBSA ................. 11

IV.  THE AFFORDABLE CARE ACT APPLIES TO BCBSA ..................................... 14

V.   BCBSA IS COVERED BY THE ADA AND WLAD ........................................ 17

     A.   THE BCBSA WEBSITE AND MOBILE APP ARE PUBLIC
          ACCOMMODATIONS ................................................................. 17

     B.   INSURANCE COMPANIES ARE PUBLIC ACCOMMODATIONS ............ 20

VI.  PLAINTIFFS MAY SEEK MONETARY AND INJUNCTIVE RELIEF ................... 23

CONCLUSION ......................................................................................................... 25

CERTIFICATE OF SERVICE .................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Access Living of Metro. Chicago v. Uber Techs., Inc.*,
    351 F. Supp. 3d 1141 (N.D. Ill. 2018) .............................................................. 18, 19

*Alexander v. United States*,
    721 F.3d 418 (7th Cir. 2013) ........................................................................ 23

*Arline v. Sch. Bd. of Nassau Cty.*,
    772 F.2d 759 (11th Cir. 1985), *aff'd and remanded*, 480 U.S. 273 (1987) ............................. 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... 4

*Ayling v. Mem'l Health Sys.*,
    No. 19-cv-3091, 2019 WL 2234061 (C.D. Ill. May 23, 2019) ................................. 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 4

*Bernard B. v. Blue Cross & Blue Shield of Greater New York*,
    528 F. Supp. 125 (S.D.N.Y. 1981) ......................................................... 12, 13

*Bernard B. v. Blue Cross & Blue Shield*,
    679 F.2d 7 (2d Cir. 1982) ........................................................................ 12

*Bilinsky v. Am. Airlines, Inc.*,
    928 F.3d 565 (7th Cir. 2019) ..................................................................... 19

*Blue Cross Blue Shield of Illinois v. Cruz*,
    495 F.3d 510 (7th Cir. 2007) ....................................................................... 9

*Bone v. Univ. of N. Carolina Health Care Sys.*,
    No. 1:18CV994, 2019 WL 4393531 (M.D.N.C. Sept. 13, 2019) ............................. 23

*Bonte v. U.S. Bank, N.A.*,
    624 F.3d 461 (7th Cir. 2010) ....................................................................... 3

*Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health*
    *& Human Servs.*,
    No. 1:20-cv-11297, 2020 WL 3891426 (D. Mass. July 9, 2020) ........................... 15

*Botsford v. Blue Cross & Blue Shield of Montana, Inc.*,
    314 F.3d 390 (9th Cir. 2002) ................................................................... 8–9

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) .................................................................................. 25

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1988) .................................................................................... 5

*Bridges v. Blue Cross & Blue Shield Ass'n*,
    935 F. Supp. 37 (D.D.C. 1996) ............................................................. 4, 5, 6

ii

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler Ass'n of New England*,
  37 F.3d 12 (1st Cir. 1994) .................................................................................. 20

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................................................... 15

*Cler v. Illinois Educ. Ass'n*,
  423 F.3d 726 (7th Cir. 2005) ............................................................................... 3

*Coventry Health Care of Missouri, Inc. v. Nevils*,
  137 S. Ct. 1190 (2017) ......................................................................................... 8

*Craft v. Health Care Serv. Corp.*,
  No. 14 C 5853, 2016 WL 1270433 (N.D. Ill. Mar. 31, 2016) ............................. 16

*Degutis v. Consol. Rail Corp.*,
  No. 93 C 5171, 1994 WL 484525 (N.D. Ill. Sept. 2, 1994).............................. 11–12

*Dieffenbach v. Barnes & Noble, Inc.*,
  887 F.3d 826 (7th Cir. 2018) .............................................................................. 23

*Dodd v. Blue Cross & Blue Shield Ass'n*,
  835 F. Supp. 888 (E.D. Va. 1993) ...................................................................... 12

*Doe v. BlueCross BlueShield of Tennessee, Inc.*,
  926 F.3d 235 (6th Cir. 2019) .............................................................................. 22

*Doe v. CVS Pharmacy, Inc.*,
  982 F.3d 1204 (9th Cir. Dec. 9, 2020) ................................................................ 22

*Doe v. Mut. of Omaha Ins. Co.*,
  179 F.3d 557 (7th Cir. 1999) .................................................................... 18, 21, 22

*Doyle v. Blue Cross Blue Shield of Illinois*,
  149 F. Supp. 2d 427 (N.D. Ill. 2001) ................................................................... 8

*Empire Healthchoice Assur., Inc. v. McVeigh*,
  547 U.S. 677, 698 (2006).................................................................................... 8

*Estate of Williams-Moore v. All. One Receivables Mgmt., Inc.*,
  335 F. Supp. 2d 636 (M.D.N.C. 2004) ......................................................... 8, 9, 10

*Fero v. Excellus Health Plan, Inc.*,
  236 F. Supp. 3d 735 (W.D.N.Y. 2017) ................................................................ 11

*Ford v. Schering-Plough Corp.*,
  145 F.3d 601 (3d Cir. 1998) .......................................................................... 18, 22

*Hayes v. Prudential Ins. Co. of Am.*,
  819 F.2d 921 (9th Cir. 1987) ............................................................................... 4

*Houck v. United States*,
  No. 17-CV-474-JPG, 2017 WL 2733905 (S.D. Ill. June 22, 2017) ....................... 25

*In re Anthem, Inc. Data Breach Litig.*,
  162 F. Supp. 3d 953 (N.D. Cal. 2016) .......................................................... *passim*

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga.*,
  No. 3:12–cv–1607–O, 2014 WL 360291 (N.D. Tex. Feb. 3, 2014)................................. 24–25

*Kolling v. Blue Cross & Blue Shield of Michigan*,
  318 F.3d 715 (6th Cir. 2003) ..................................................................................... 22

*Lacy v. Cook Cty.*,
  897 F.3d 847 (7th Cir. 2018) ..................................................................................... 24

*Levin v. Madigan*,
  41 F. Supp. 3d 701 (N.D. Ill. 2014) ............................................................................. 8

*Lewis v. Phan*,
  No. 19-0314-JCC, 2020 WL 885751 (W.D. Wash. Feb. 24, 2020) ......................................... 22

*Mahajan v. Blue Cross Blue Shield Ass'n*,
  2017 WL 4250514 (S.D.N.Y. Sept. 22, 2017)..................................................................... 10

*Massey v. Churchview Supportive Living, Inc.*,
  No. 17 C 2253, 2018 WL 999900 (N.D. Ill. Feb. 21, 2018)................................................... 12

*Menzies v. Seyfarth Shaw LLP*,
  943 F.3d 328 (7th Cir. 2019) ............................................................................ 4, 7, 8, 13

*Morgan v. Joint Administration Board, Retirement Plan of the Pillsbury Co. &
  American Federation of Grain Millers*,
  268 F.3d 456 (7th Cir. 2001) ............................................................................... *passim*

*Morton v. Mancari*,
  417 U.S. 535 (1974)...................................................................................................... 7

*Nat'l Fed'n of Blind v. Target Corp.*,
  582 F. Supp. 2d 1185 (N.D. Cal. 2007) ......................................................................... 23

*National Federation of the Blind v. United Airlines, Inc.*,
  No. C 10-04816 WHA, 2011 WL 1544524 (N.D. Cal. Apr. 25, 2011)..................................... 10

*Negron v. Patel*,
  6 F. Supp. 2d 366 (E.D. Pa. 1998) .................................................................................. 4

*New York v. U.S. Dep't of Health & Human Servs.*,
  No. 1:20-cv-05583, 2020 WL 4059929 (S.D.N.Y. July 20, 2020)......................................... 15

*Pallozzi v. Allstate Life Ins. Co.*,
  198 F.3d 28 (2d Cir. 1999) ......................................................................................... 21

*Parker v. Metro. Life Ins. Co.*,
  121 F.3d 1006 (6th Cir. 1997) .............................................................................. 18, 22

*Pellicano v. Blue Cross Blue Shield Ass'n*,
  No. 11–406, 2012 WL 1828027 (M.D. Pa. May 18, 2012)................................................... 25

*Randolph v. IMBS, Inc.*,
  368 F.3d 726 (7th Cir. 2004) ........................................................................................ 7

*Reed v. Columbia St. Mary's Hosp.*,
  782 F.3d 331 (7th Cir. 2015) ....................................................................................... 24

*Religious Sisters of Mercy v. Azar*,
No. 3:16-CV-00386, 2021 WL 191009 (D.N.D. Jan. 19, 2021) ........................... 16

*Retired Chicago Police Ass'n v. City of Chicago*,
7 F.3d 584 (7th Cir. 1993) ................................................................................ 23

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*,
786 F.3d 510 (7th Cir. 2015) ....................................................................... 13–14

*Straw v. Am. Bar Ass'n*,
2015 WL 602836 (N.D. Ill. Feb. 11, 2015) ...................................................... 19

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
477 U.S. 597 (1986) ......................................................................................... 12

*Util. Air Regul. Grp. v. EPA*,
134 S. Ct. 2427 (2014) ..................................................................................... 16

*Wai v. Allstate Ins. Co.*,
75 F. Supp. 2d 1 (D.D.C. 1999) ....................................................................... 21

*Walker v. Azar*,
480 F. Supp. 3d 417 (E.D.N.Y. 2020) ............................................................. 15

*Walker v. Azar*,
No. 20CV2834FBSMG, 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020)................. 15

*Wash. State Commc'n Access Project v. Regal Cinemas, Inc.*,
293 P.3d 413 (Wash. 2013) ............................................................................. 22

*Washington v. U.S. Dep't of Health & Human Servs.*,
No. 2:20-cv-01105, 2020 WL 4050303 (W.D. Wash. July 16, 2020)................. 15

*Welsh v. Boy Scouts of America*,
993 F.2d 1267 (7th Cir. 1993) ......................................................................... 19

*Weyer v. Twentieth Century Fox Film Corp.*,
198 F.3d 1104 (9th Cir. 2000) ..................................................................... 18, 22

*Wilson v. Integrated Med. Sys., Inc.*,
No. 14 CV 5726, 2016 WL 4734362 (N.D. Ill. Sept. 12, 2016)........................ 12

*Wright v. Thread Experiment, LLC*,
No. 1:19-cv-01423-SEB-TAB, 2021 WL 243604 (S.D. Ind. Jan. 22, 2021) ........ 18

*Zachary M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 202*,
829 F. Supp. 2d 649 (N.D. Ill. 2011) ............................................................... 24

*Zeigan v. Blue Cross & Blue Shield of Greater New York*,
607 F. Supp. 1434 (S.D.N.Y. 1985) ............................................................. 5, 6

## Statutes

5 U.S.C. § 702 ..................................................................................................... 25

5 U.S.C. § 5371 ................................................................................................... 15

5 U.S.C. § 8902 ................................................................................................ *passim*

29 U.S.C. § 794 ........................................................................................................ 11

29 U.S.C. § 1002 ...................................................................................................... 20

42 U.S.C. § 12181 .................................................................................................... 21

42 U.S.C. § 18116 .................................................................................................... 14

**Rules**

Fed. R. Civ. P. 25 ...................................................................................................... 1

Fed. R. Civ. P. 8 ...................................................................................................... 23

Fed. R. Civ. P. 9 ...................................................................................................... 23

**Regulations**

5 C.F.R. § 890.107 ................................................................................................ 4, 5

45 C.F.R. § 84.3 ...................................................................................................... 11

45 C.F.R. § 92.3 ...................................................................................................... 16

45 C.F.R. § 92.301 .................................................................................................. 17

45 C.F.R. § 160.103 ................................................................................................ 15

81 Fed. Reg. 31,375 ............................................................................................ 14, 17

81 Fed. Reg. 31,467 .............................................................................................. 14

**Other Authorities**

*McGettigan to Once Again Take Up Temporary Personnel Leadership* (Jan. 20, 2021),
   https://www.federaltimes.com/management/leadership/2021/01/21/mcgettigan-to-once-
   again-take-up-temporary-personnel-leadership/ ................................................ Cover

U.S. Dep't of Commerce, "Quarterly Retail E-Commerce Sales 3rd Quarter 2020" (Nov. 19,
   2020) (web sales grew from 4.5% of retail in 2011 to 14.3% in Q3 of 2020),
   https://www.census.gov/retail/mrts/www/data/pdf/ec_current.pdf?#:~:text=E%2Dcommerce%
   20sales%20in%20the,the%20second%20quarter%20of%202020 ........................................ 20

U.S. Dep't of Justice,  *ADA Title III Technical Assistance Manual*, § III–3.11000,
   https://www.ada.gov/taman3.html ...................................................................... 21

U.S. Patent & Trademark Office,
   http://tmsearch.uspto.gov/bin/gate.exe?f=searchss&state=4802:y37yx7.1.1 ............................ 2

## **INTRODUCTION**

In its Motion to Dismiss, Defendant Blue Cross Blue Shield Association ("BCBSA") does not dispute Plaintiffs' allegations that its website, www.fepblue.org, and its fepblue mobile application are inaccessible to blind and visually impaired individuals. Instead, BCBSA advances purely legal arguments, asserting that Plaintiffs' claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Affordable Care Act ("ACA"), and the Washington Law Against Discrimination ("WLAD") are legally barred. BCBSA's arguments must be rejected.

First, contrary to BCBSA's assertions, Plaintiffs' claims, which concern communication rather than underlying benefits, do not fall within the narrow ambit of the Federal Employee Health Benefits Act ("FEHBA"), which applies only to insurance benefit claims. Second, BCBSA's procurement contract with the federal government does not automatically shelter it from complying with the Rehabilitation Act. BCBSA's receipt of federal financial assistance is a factual question, involving whether it receives market rates in its contract with the Office of Personnel Management ("OPM") or whether it uses federal funds received by any of its 36 local affiliates. This factual determination cannot be resolved at the pleadings stage. Third, the U.S. Department of Health and Human Services' ("HHS") recently enacted rule interpreting the ACA's nondiscrimination provision to exclude insurers is not entitled to deference and should not be applied in this case. Even if HHS's new rule applies, BCBSA is subject to the ACA's nondiscrimination provisions because it is a recipient of federal financial assistance and Plaintiffs' claims involve communications (made through an inaccessible website and mobile application) about BCBSA's Federal Employee Health Benefits Plan ("FEHBP") and other BCBSA services; they do not implicate the substance of BCBSA's plan. This places Plaintiffs' ACA claim firmly within the Act's nondiscrimination provisions. Finally, BCBSA's website and mobile app do not need to be tethered to a physical location to be considered a place of public accommodation under

1

the ADA and the WLAD and insurers like BCBSA are places of public accommodation under these statutes. Accordingly, Plaintiffs respectfully request that BCBSA's Motion to Dismiss be denied.

## **FACTS**

Plaintiff Jamal Mazrui is a retired federal government employee. (First Am. Compl. ["FAC"] ¶ 8, ECF No. 58). He is enrolled in the Blue Cross Blue Shield Federal Employee Program ("BCBS FEP"), which is offered through the Federal Employees Health Benefits Program. (*Id.* ¶¶ 1, 8). Mr. Mazrui is blind and is a member of Plaintiff National Federation of the Blind, "the oldest and largest national organization of blind persons," with "affiliates in all 50 states." (*Id.* ¶¶ 8–9). The NFB's mission is "the complete integration of blind individuals into society on a basis of equality," which includes "promoting accessible technology for blind people so they can live and work independently in today's technology-dependent world." (*Id.* ¶¶ 10–11).

Defendant BCBSA is a national association of "36 independent, community-based, and locally operated Blue Cross Blue Shield companies." (*Id.* ¶ 16). BCBSA contracts with OPM to provide health insurance to federal employees, family members, former employees, retirees, and former spouses through the FEHBP. (*Id.*). BCBSA owns, operates, and maintains a website, www.fepblue.org, and a mobile app where it provides information about plan benefits, as well as other services, programs, and activities. (*Id.* ¶¶ 22–25). For example, BCBSA encourages enrollees to sign up for MyBlue®,[2] a "personal health website," where they can view their personal health records and access a variety of programs and services, including a "Wellness Incentive Program,"

---

[2] It is unclear how BCBSA can hold a service mark for MyBlue® for "[h]ealth care services, namely, wellness programs," yet contend that OPM is solely responsible for the contents of the fepblue website and mobile app. Trademark Search for "MyBlue," U.S. Patent & Trademark Office, http://tmsearch.uspto.gov/bin/gate.exe?f=searchss&state=4802:y37yx7.1.1 (search "Search Term" field for "MyBlue"; select Reg. Number 4085124).

which provides rewards for completing health assessments. (*Id.* ¶ 24). These programs are only available through MyBlue®. (*Id.*). BCBSA encourages members to download its fepblue mobile app for "24/7 access to helpful features, tools and information related to your Blue Cross and Blue Shield Service Benefit Plan benefits," including coverage details, claim term definitions, and notifications of wellness awards and incentives. (*Id.* ¶ 25).

Mr. Mazrui and the NFB's FEP-eligible members have encountered barriers on fepblue.org and the fepblue mobile app that make them incompatible with screen reader software. (*Id.* ¶¶ 27–29). As a result, Mr. Mazrui and the NFB's FEP-eligible members "cannot independently access Explanation of Benefits; order new ID cards; send secure messages; update their member, contact, or health information; complete health assessments; or receive rewards"—all information and features that sighted individuals are readily able to access. (*Id.* ¶ 29). Notwithstanding these obvious barriers, BCBSA falsely claims in its FEP plan brochure for 2021 that its website, www.fepblue.org, "adheres to the most current Section 508 Web accessibility standards to ensure that visitors with visual impairments can use the site with ease." (*Id.* ¶ 26; Mem. In Supp. of Def.'s Mot. to Dismiss ["Def.'s Mot."] Ex. A at 125, ECF No. 67-1). Mr. Mazrui's experience has certainly not been one of "ease." He has had "no ability to access his health insurance information privately and independently" and instead "must rely on friends or family and telephone interactions with BCBSA staff, when those staff are willing to assist him." (FAC ¶ 32).

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) is warranted only if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005) (citations omitted). "[T]he bar to survive a motion to dismiss is not high." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Court takes the facts in the

complaint as true and view them in the light most favorable to the plaintiffs. *Menzies v. Seyfarth*

*Shaw LLP*, 943 F.3d 328, 332 (7th Cir. 2019).

## ARGUMENT

### I.    THE FEDERAL EMPLOYEE HEALTH BENEFITS ACT DOES NOT BAR PLAINTIFFS' FEDERAL AND STATE LAW CLAIMS AGAINST BCBSA.

Contrary to BCBSA's assertions, the FEHBA does not bar all federal and state law claims

against insurance carriers like BCBSA.[3] BCBSA misconstrues Plaintiffs' claims in an attempt to

shoehorn them into the FEHBA's narrowly limited causes of action.

The FEHBA was established to provide federal employees and retirees with "subsidized

health care benefits." *Hayes v. Prudential Ins. Co. of Am.*, 819 F.2d 921, 922 (9th Cir. 1987). The

FEHBA prohibits insurance plans from "exclud[ing] an individual because of . . . health status." 5

U.S.C. § 8902(f). OPM regulations specifically designate what suits must be brought directly

against OPM under the FEHBA. The regulations limit such cases to those that "review the legality

of OPM's regulations" and "involve[e] [the] denial of health benefits." 5 C.F.R. § 890.107(a)–(c).

Courts have held that the FEHBA bars claims brought under different laws only when the

substance of the claim is expressly contemplated by the FEHBA and its implementing regulations.

*See Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 41 (D.D.C. 1996) ("[T]he

exclusive remedy for an action *cognizable under* the FEHBA lies under the FEHBA." (emphasis

added)); *Negron v. Patel*, 6 F. Supp. 2d 366, 372–73 (E.D. Pa. 1998) ("[Though OPM] regulations

seem to contemplate a mandatory procedure [for all claims], [they apply] only for challenges to a

---

[3] BCBSA also points to the grievance procedures in its 2021 Plan Brochure. (Def.'s Mot. at 6; *id.* Ex. A at 5–6). Nothing mandates that Plaintiffs follow these procedures.

carrier's decision to deny benefits."). Courts have held that claims regarding discriminatory benefit provisions in an insurer's plan must be brought against OPM under the FEHBA. *See Zeigan v. Blue Cross & Blue Shield of Greater New York*, 607 F. Supp. 1434, 1438 (S.D.N.Y. 1985) (lawsuit regarding the failure to provide benefits for long-term mental illness hospitalization must be brought against OPM under the FEHBA).

Plaintiffs' claims do not fall within the FEHBA or its implementing regulations for two reasons. First, Plaintiffs' claims are not the type the FEHBA authorizes against OPM; they neither challenge "the legality of OPM's regulations" nor "involve[e] [the] denial of health benefits." 5 C.F.R. § 890.107(a)–(c). Rather, Plaintiffs allege that BCBSA has failed to provide access to electronic information *regarding* benefits and other BCBSA services through its website, fepblue.org, and fepblue mobile app. (FAC ¶ 1). Second, Plaintiffs do not allege that any of the plan benefits BCBSA offers through its FEHBP discriminate against them because of Mr. Mazrui's or NFB members' health status, in violation of the FEHBA. Plaintiffs' claims are not a dispute over insurance benefits—they are about access to information.

BCBSA relies on *Bridges* to argue that the FEHBA does not allow other federal and state law claims against insurance carriers that contract with OPM, but *Bridges* does not stand for this proposition.[4] In *Bridges*, enrollees in a FEHBP, alleged that BCBSA's licensing entities negotiated discounts with member facilities and physicians that were hidden from plan enrollees, and then

---

[4] BCBSA also cites *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), but *Boyle* does not stand for the proposition that government contractors discharging their duties under a procurement contract are governed only by the federal law that authorized that contract. *Boyle* involved a state law wrongful death claim based on alleged design defects against an independent contractor who supplied the government with a military helicopter, not the FEHBA. *Id.* at 503. The Supreme Court limited the preemption of state laws holding government contractors liable for design defects under certain discrete circumstances, none of which are applicable here. *See id.* at 513.

failed to apply those discounts to the enrollees' co-payments or disclose the existence of these discounts in Explanations of Benefits. 935 F. Supp. at 40. The plaintiffs claimed that this scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and was a breach of BCBSA's insurance contract with OPM. *Id.* The court concluded that the FEHBA displaced the plaintiffs' RICO claim and preempted their state law contract claims not because the FEHBA preempts *all* other federal and state law claims, but because the FEHBA has "a comprehensive administrative enforcement mechanism for *review of disputed claims*." *Id.* at 42 (emphasis added). Plaintiffs' federal and state law claims do not involve the review of disputed insurance claims— or any other claims expressly contemplated by the FEHBA—and therefore fall outside the scope of OPM's "comprehensive administrative enforcement mechanism." *Id.*

Although BCBSA attempts to paint the FEHBA as broad, recent precedent has taken "a more narrow understanding" of the FEHBA, making clear that there is no displacement when a claim does not involve benefits. *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1012 (N.D. Cal. 2016). For example, the *Anthem* court distinguished *Bridges* and permitted plaintiffs' third-party beneficiary claim against BCBSA for failing to ensure the privacy of enrollees' data to proceed. The court reasoned that the RICO claim in *Bridges* was like a "health benefits claim" that must be brought against OPM because overcharging for copays implicated benefits, but the *Anthem* plaintiffs' data privacy could have been breached without implicating any of the plaintiffs' health benefits. *Id.* 1011. Similarly, here, Plaintiffs' allegations in no way implicate their underlying benefits; they are concerned only with access to information about their benefits.

Likewise, *Zeigan*, 607 F. Supp. 1434, on which BCBSA also relies, is inapposite. In *Zeigan*, the plaintiff sued BCBSA and OPM for violating 5 U.S.C. § 8902(f)—the FEHBA provision that prohibits plan benefits from discriminating on the basis of health status—because

her FEHBP benefits discriminated against individuals with mental illness in failing to cover long-term mental illness hospitalization. *Id.* at 1438. The court concluded that because § 8902(f) only applies to OPM, the plaintiffs had to bring their claims against OPM only. *Id.* Here, by contrast, Plaintiffs are not alleging that BCBSA's plan benefits discriminate against them on the basis of health status. Plaintiffs instead allege that BCBSA's website and mobile application fail to provide blind users effective communication, violating their rights under the ADA, the Rehabilitation Act, the ACA, and the WLAD. These statutes provide their own civil action provisions to enforce Plaintiffs' rights; they do not rely on FEHBA provisions to bring suit.

Plaintiffs' reading of the FEHBA comports with how the Seventh Circuit analyzes alleged conflicts between different federal statutes under the rubric of "implied repeal." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 732 (7th Cir. 2004). Assuming, as BCBSA argues, that the FEHBA, on the one hand, and the ADA, the Rehabilitation Act, and the ACA, on the other, address the same subject in different ways, the court must examine whether the FEHBA implicitly repeals these other federal statutes. *Id at 730.* Implied repeal is "a rare bird," *id.*, however, because "courts must employ a strong presumption" that each of the statutes in alleged conflict "be given its full effect," *Menzies*, 197 F. Supp. 3d at 1111 (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). It requires "either irreconcilable conflict between the statutes or a clearly expressed legislative decision that one replace the other." *Randolph*, 368 at 730.

The only provision in the FEHBA to address its interaction with other laws is 5 U.S.C. § 8902(m)(1). But that provision pertains solely to conflict with "*state or local*" law; it provides no guidance about the FEHBA's relationship with other *federal* laws. In addition, the Court can harmonize the FEHBA with the ACA, ADA, and Rehabilitation Act, none of which concern the qualifications for carriers or benefit types, levels, and rates that are the hallmarks of

the FEHBA, and instead concern ineffective communication. Thus, the FEHBA does not displace the ACA, ADA, and Rehabilitation Act. *See, e.g.*, *Menzies*, 197 F. Supp. 3d at 1111 (when "two statutes are capable of co-existence . . . it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective" (citation omitted)); *Levin v. Madigan*, 41 F. Supp. 3d 701, 706–07 (N.D. Ill. 2014) (holding that "comprehensive statutory scheme" of Government Employee Rights Act did not preclude § 1983 claim).

## II. THE FEHBA DOES NOT PREEMPT PLAINTIFFS' WASHINGTON LAW AGAINST DISCRIMINATION CLAIM.

The FEHBA's preemption provision, 5 U.S.C. § 8902(m)(l), "does not purport to render inoperative any and all state laws that in some way bear on federal employee-benefit plans." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 698 (2006). The Supreme Court places the following two preconditions on the FEHBA's preemption provision: (1) that the state law claim "relates to health insurance or plans"; and (2) that the state law claim "'relate[s] to the nature, provision, or extent of coverage or benefits,' 'including payments with respect to benefits.'" *Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190, 1196 (2017) (quoting 5 U.S.C. § 8902(m)(1)).

Courts have interpreted "benefits" narrowly to preempt claims that "arise[ ] out of a disputes over 'denial of benefits' and 'the nature or extent of coverage for benefits.'" *Estate of Williams-Moore v. All. One Receivables Mgmt., Inc.*, 335 F. Supp. 2d 636, 654 (M.D.N.C. 2004) (citations omitted). Applying this interpretation, courts have held that the FEHBA preempts state law breach of contract or fraud claims for the denial of benefits, *see, e.g.*, *Doyle v. Blue Cross Blue Shield of Illinois*, 149 F. Supp. 2d 427, 433 (N.D. Ill. 2001), because applying different state standards to denial of benefits claims would "disrupt the nationally uniform administration of benefits which FEHBA provides," *Anthem*, 162 F. Supp. 3d at 1014 (quoting *Botsford v. Blue*

*Cross & Blue Shield of Montana, Inc.*, 314 F.3d 390, 395 (9th Cir. 2002)). Conversely, courts have held that plaintiffs' state law medical malpractice claims are not preempted by the FEHBA because they do not relate to the denial of benefits, and there is no conflict between a state's interest in regulation of quality of healthcare and the federal interest in the uniform administration of benefits. *See, e.g.*, *Williams-Moore*, 335 F. Supp. 2d at 655–6; *see also Blue Cross Blue Shield of Illinois v. Cruz*, 495 F.3d 510, 513 (7th Cir. 2007) (explaining that a tort judgment against a third party would not result in "a disuniformity in benefits" that Congress was concerned with when enacting the FEHBA).

*Anthem* extended the logic of the medical malpractice cases to a plaintiff's data privacy claim under California's Unfair Competition Law ("UCL"). 162 F. Supp. 3d 953 at 1015. The *Anthem* plaintiffs brought state and federal law claims against several insurance companies and their affiliates, including BCBSA, arising out of a cyberattack on an insurance company's database. *Id.* at 966–68. The court concluded that because data privacy does not implicate benefits and the UCL claim did not interfere with the federal interest in FEHBA plan interpretation, the UCL claim was not expressly preempted by § 8902(m)(l). *Id.* at 1014.

Here, Plaintiffs' WLAD claim is not preempted because it does not relate to health insurance coverage, benefits provided under an insurance plan, or the nature, provision, or extent of coverage or benefits. Instead, it involves the way in which information about the plan is conveyed to blind individuals. Like the state law medical malpractice and data privacy claims, it does not involve a dispute over benefits and does not require that Plaintiffs exercise their benefits to be subject to discrimination. Nor does it implicate concerns of the nationally uniform administration of benefits the FEHBA provides.

BCBSA's reliance on *National Federation of the Blind v. United Airlines, Inc.*, No. C 10-04816 WHA, 2011 WL 1544524 (N.D. Cal. Apr. 25, 2011), is misplaced. In *United Airlines*, the plaintiffs sued the airline under two state anti-discrimination laws for failing to make its ticketing kiosks accessible. *Id.* The court concluded that the Airline Deregulation Act's preemption provision, which provided that a state "may not enact or enforce a law 'related to a price, route, or service of an air carrier,'" preempted one of the state-law claims. *Id.* at *4. There, however, the court's holding hinged on the preemption provision's broad definition of "services" which it concluded "extend beyond prices, schedules, origins, and destinations," and thus encompassed airline kiosks. *Id.* at *5, 7. Here, the term "benefits" in the FEHBA's preemption provision has been interpreted narrowly to preempt only claims that "arise[ ] out of a dispute over 'denial of benefits' and 'the nature or extent of coverage for benefits.'" *See Williams-Moore*, 335 F. Supp. 2d at 654 (citations omitted). Because Plaintiffs' WLAD claim does not involve benefits, it does not fall within the FEHBA's narrow preemption provision. *See Anthem*, 162 F. Supp. 3d 1014–15.

BCBSA also relies on *Mahajan v. Blue Cross Blue Shield Ass'n*, No. 16-CV-6944 (PKC), 2017 WL 4250514 (S.D.N.Y. Sept. 22, 2017), where the plaintiffs attempted to impose state-law requirements on the *content* of BCBSA's plan brochures by attempting to regulate disclosures made about those plans. *Id.* at 3–5. BCBSA tries to liken Plaintiffs' claims to *Mahajan* as an attempt to regulate "the format and type of informational materials provided to plan participants." (Def.'s Mot. at 8) (quoting *Mahajan*). BCBSA fundamentally misunderstands what it means to provide accessible electronic content. Making fepblue.org and the fepblue mobile app accessible would not require altering the format or type of informational materials provided to plan participants; it would only require computer programming to remove barriers to accessing those informational materials.

BCBSA's fallback position is that the FEHBA impliedly preempts Plaintiffs' WLAD claim because it interferes with OPM's authority to regulate plans and carriers as well as the nationwide uniformity Congress intended. (Def.'s Mot. at 9). Courts have rejected this argument in the context of state law claims for breaches of data privacy, citing the fact that the FEHBA implicates congressional concerns over the uniform administration of health benefits, as opposed to data privacy. *See Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 779 (W.D.N.Y. 2017) (rejecting BCBSA's conflict preemption argument, concluding that "the purpose of FEHBA does not, as a matter of law, evidence an intent to preempt state law claims arising out of promises concerning data security"); *Anthem*, 162 F. Supp. 3d at 1015 (concluding that the FEHBA did not preempt a plaintiff's state law claim for breach of data privacy). Similarly, here, because the FEHBA was not intended to address the discriminatory failure to provide equal access to information about benefits, it would not interfere with the federal interest in ensuring uniformity in BCBSA's benefits, thus precluding implied preemption.

## III.     SECTION 504 OF THE REHABILITATION ACT APPLIES TO BCBSA.

Section 504 prohibits any entity "receiving Federal financial assistance" from engaging in disability discrimination. 29 U.S.C. § 794. HHS defines "federal financial assistance" as: "[a]ny grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department provides or otherwise makes available assistance in the form of . . . funds . . . ." 45 C.F.R. § 84.3(h). Congress's "single overriding purpose" in enacting § 504 was "to ensure that the funds of the United States were not used to support discriminatory practices." *Arline v. Sch. Bd. of Nassau Cty.*, 772 F.2d 759, 762 n.9 (11th Cir. 1985) (citation omitted), *aff'd and remanded*, 480 U.S. 273 (1987).

Courts have "very broadly construed" the term "federal financial assistance" "to encompass assistance of any kind, direct or indirect." *Degutis v. Consol. Rail Corp.*, No. 93 C

5171, 1994 WL 484525, at *4 (N.D. Ill. Sept. 2, 1994) (citation omitted); *see also U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 606 (1986). Courts have held that compensation under a procurement contract at above-market rates is federal financial assistance. *See, e.g.*, *Wilson v. Integrated Med. Sys., Inc.*, No. 14 CV 5726, 2016 WL 4734362, at *4 (N.D. Ill. Sept. 12, 2016) (citing *Degutis*, 1994 WL 484525, at *3). This is an issue that is resolved at the summary judgment stage. *See Degutis*, 1994 WL 484525, at *3 (denying defendant's motion to dismiss where it had submitted an affidavit stating that the federal government pays fair market value for its services because it left a genuine issue of material fact regarding whether the defendant does in fact receive federal financial assistance). The receipt of Medicare funds also constitutes federal financial assistance. *See, e.g.*, *Massey v. Churchview Supportive Living, Inc.*, No. 17 C 2253, 2018 WL 999900 (N.D. Ill. Feb. 21, 2018) (collecting cases); *Bernard B. v. Blue Cross & Blue Shield of Greater New York*, 528 F. Supp. 125, 132 (S.D.N.Y. 1981) (holding that a locally operated Blue Cross Blue Shield Company's receipt of Medicare, Part A funds constituted federal financial assistance under the Rehabilitation Act), *aff'd sub nom. Bernard B. v. Blue Cross & Blue Shield*, 679 F.2d 7 (2d Cir. 1982). This, too, is an issue that is resolved at the summary judgment stage. *See Bernard B.*, 528 F. Supp. at 132 (concluding that the intermingling of Medicare and other Blue Cross funds raised a genuine issue of material fact concerning whether the local Blue Cross affiliate was a recipient of "federal financial assistance").

BCBSA has failed to demonstrate that Plaintiffs' claims, as alleged, fail as a matter of law.[5] BCBSA's receipt of federal financial assistance is a factual question involving whether it receives

---

[5] BCBSA principally relies on *Dodd v. Blue Cross & Blue Shield Ass'n*, 835 F. Supp. 888 (E.D. Va. 1993), but this case is readily distinguishable for two reasons. First, the issue of whether BCBSA is the recipient of federal financial assistance and is therefore subject to § 504 was not before the court. Second, the plaintiffs brought claims against BCBSA and OPM alleging that the exclusion of certain types of blood transfusions from coverage in BCBSA's Service Benefit Plan

12

market rates in its contract with OPM or whether it uses federal funds received by any of its 36 local affiliates. These are factual determinations that cannot be resolved at the pleadings stage, where the Court must take the allegations in the First Amended Complaint as true and view them in a light most favorable to Plaintiffs. *Menzies*, 943 F.3d at 332. Plaintiffs allege that "BCBSA contracts with OPM to establish the benefits and premiums for the BCBS FEP" and that the federal government "pays approximately 72% of the premiums for persons enrolled in the FEHBP." (FAC ¶¶ 14, 16). If the federal government is paying higher than market rate for premiums paid to BCBSA or a higher percentage of the premium than other employers, this would constitute federal financial assistance. In addition, if any of the 36 locally operated affiliates receive federal financial assistance from Medicare or Medicaid, and then provide some of those funds to BCBSA, BCBSA could be considered a recipient of federal financial assistance. *See Bernard B.*, 528 F. Supp. at 132. BCBSA cannot establish that it does not receive federal financial assistance without relying on extraneous, unproven facts that are outside the four corners of Plaintiffs' First Amended Complaint.[6] Plaintiffs' allegations that BCBSA receives financial assistance are sufficient to survive a motion to dismiss. If the Court would like Plaintiffs to clarify their allegations, Plaintiffs request leave to amend their pleadings to add allegations consistent with their arguments above. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520

---

violated § 504. *Id.* at 891. The court reasoned that § 504 compliance fell solely on OPM because it is OPM's "responsibility under the FEHBA to determine which benefits and exclusions apply in the Service Benefit Plan" and "Congress has assigned to OPM sole decision-making authority and responsibility over FEHB contracts." *Id.* Here, the question of whether BCBSA receives federal financial assistance is squarely before the court, and Plaintiffs' claims do not implicate the BCBSA benefit plan or any contractual provisions.

[6] BCBSA asserts, without any evidentiary support, that it "has a contractual relationship with OPM to provide for market-value services." (Def.'s Mot. at 10 n.7). This is an unsunstantiated assertion in the footnote of BCBSA's Motion which the Court should not credit as fact when ruling on BCBSA's Motion.

(7th Cir. 2015) (reversing district court's decision denying plaintiff leave to amend her pleading to allege that defendant was the recipient of federal financial assistance).

## IV.     THE AFFORDABLE CARE ACT APPLIES TO BCBSA.

The ACA contains a broad nondiscrimination provision, §1557, which requires that individuals not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. § 18116(a). Section 1557 expressly incorporates four federal civil rights laws barring discrimination: Title VI of the Civil Rights Act, Title IX of the Education Amendments, the Age Discrimination Act, and the Rehabilitation Act. *Id.*

In 2016, HHS published § 1557 regulations (the "2016 Rule") that interpreted "health program or activity" to mean "the provision or administration of . . . health-related insurance coverage, or other health-related coverage . . . ." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,467 (May 18, 2016). HHS specifically listed "health insurance issuer[s]" and "group health plan[s]" as falling under this definition, placing insurers like BCBSA squarely within the ambit of the ACA's nondiscrimination provisions. *Id.* HHS adopted its approach from the Civil Rights Restoration Act of 1987 ("CRRA"), which amended the same four civil rights statutes the ACA expressly incorporates to expansively define "program or activity." *Id.* at 31,385. HHS's interpretation "serve[d] the central purposes of the ACA[ ] and effectuate[d] Congressional intent" by barring insurers from discriminating, which would "enhance[e] access to services and coverage." *Id.* at 31,386.

On June 19, 2020, HHS published a rule (the "2020 Rule") that narrowed the definition of "health program or activity" so that it no longer expressly included insurance companies. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of

14

Authority, 85 Fed. Reg. 37,160 (June 19, 2020). The 2020 Rule rejects the 2016 Rule's reliance on the CRRA to include health-related insurance coverage in its definition of "program or activity." *Id.* at 37,172. The 2020 Rule instead relies on the definition of "health care" in 5 U.S.C. § 5371, which defines who is a health care worker for the purposes of federal government employment, and in 45 C.F.R. § 160.103, which defines "health care" under the Social Security Act. Neither definition is related to the ACA, health insurance, or discrimination. *See* 85 Fed. Reg. at 37,172. (Commenters on the 2020 Rule "pointed out the statutory definition of 'healthcare' relied upon in the proposed rule is unrelated to either the ACA, health insurance, or discrimination, and thus is not intended for or relevant to Section 1557 or health insurance."). This rule went into effect on August 18, 2020.[7]

HHS's novel interpretation of "health care" in its 2020 Rule, which draws from a statute and a regulation unrelated to the ACA, is not entitled to deference and should not be applied to Plaintiffs' ACA claim. A federal agency is entitled to *Chevron*[8] deference in its interpretation of a statute only if: (1) the statute is ambiguous; and (2) the agency's interpretation of the statute is

---

[7] The 2020 Rule is subject to five separate legal challenges under the Administrative Procedure Act ("APA") seeking to enjoin enforcement of its repeal of the 2016 Rule's specific protections against discrimination based on gender identity and termination of pregnancy. *See Walker v. Azar*, 480 F. Supp. 3d 417 (E.D.N.Y. 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020); *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Human Servs.*, No. 1:20-cv-11297, 2020 WL 3891426 (D. Mass. July 9, 2020); *Washington v. U.S. Dep't of Health & Human Servs.*, No. 2:20-cv-01105, 2020 WL 4050303 (W.D. Wash. July 16, 2020); *New York v. U.S. Dep't of Health & Human Servs.*, No. 1:20-cv-05583, 2020 WL 4059929 (S.D.N.Y. July 20, 2020). In *Walker* and *Whitman-Walker*, both courts concluded that HHS violated the APA and enjoined certain provisions in the 2020 Rule related to sex, gender identity, and sex stereotyping. *Walker*, 480 F. Supp. 3d at 430; *Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 6363970, at *4 (E.D.N.Y. Oct. 29, 2020); *Whitman-Walker*, 2020 WL 5232076, at *26. Dispositive motions are pending in *Boston Alliance* and *New York*. *Washington* was dismissed for lack of standing. No. C20-1105JLR, 2020 WL 5095467 (W.D. Wash. Aug. 28, 2020).

[8] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

reasonable. *Craft v. Health Care Serv. Corp.*, No. 14 C 5853, 2016 WL 1270433, at *8 (N.D. Ill. Mar. 31, 2016) (citations omitted).

HHS's 2020 interpretation of "health care" is unreasonable. In the 2020 Rule, HHS unreasonably imported definitions of "health care" from an unrelated statute and regulation that are untethered to the ACA's provisions. This is certainly not "within the bounds of reasonable interpretation." *Craft*, 2016 WL 1270433, at *9 (quoting *Util. Air Regul. Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014)). The 2016 Rule, by contrast, used the definition of "program or activity" from the CRRA, which amended the four civil rights statutes the ACA expressly incorporates, to interpret "health program or activity." Accordingly, the Court should not give deference to the 2020 Rule's unreasonable definition of "health program or activity," and instead should apply the 2016 Rule's definition that draws from a statute related to the ACA.

Even if the Court were to apply the 2020 Rule to Plaintiffs' ACA claims, however, BCBSA's arguments would still fail. First, BCBSA asserts that it is not a "health program or activity" as defined under the 2020 Rule "because [it] principally facilitates the provision of health insurance, not healthcare." (Def.'s Mot. at 11). BCBSA overlooks the new "health program or activity" definition's inclusion of entities not principally engaged in the business of providing healthcare, to the extent the entity's operations receive federal financial assistance. 45 C.F.R. § 92.3(b). In other words, if any of an insurer's operations receives federal financial assistance, that operation is subject to the ACA's nondiscrimination provisions. *Religious Sisters of Mercy v. Azar*, No. 3:16-CV-00386, 2021 WL 191009, at *6 (D.N.D. Jan. 19, 2021) (citing 85 Fed. Reg. at 37,172). Therefore, as with Plaintiffs' Rehabilitation Act claim, BCBSA's assertion that it does not receive federal financial assistance is a factual question that cannot be resolved on the pleadings.

Next, BCBSA contends that because the 2020 Rule specifically excludes FEHB plans such as its FEP Blue Plan from complying with § 1557, that its inaccessible website and mobile application are also exempt. BCBSA is incorrect. As HHS has explained, its 2020 Rule carves out FEHBA *plans* themselves, but this carve out does not mean that communications about those plans are removed from the statute's nondiscrimination requirements. *See* 85 Fed. Reg. at 37,173. Plaintiffs' claims do not implicate BCBSA's FEHB plan in any way. Rather, their claims concern effective communication only: BCBSA has failed to ensure that its fepblue website and mobile app, which convey information about BCBSA's insurance plan and provide other electronic health resources, are accessible to blind individuals. (FAC ¶¶ 1, 23–26). Because Plaintiffs' claims do not implicate BCBSA's FEHB plan, the Court should reject BCBSA's attempt to exclude its website and mobile app from the ACA's nondiscrimination provisions.[9]

## V.  BCBSA IS COVERED BY THE AMERICANS WITH DISABILITIES ACT AND THE WASHINGTON LAW AGAINST DISCRIMINATION.

### A.  BCBSA'A WEBSITE AND MOBILE APP ARE PUBLIC ACCOMMODATIONS.

The Seventh Circuit in *Morgan v. Joint Administration Board, Retirement Plan of the Pillsbury Co. & American Federation of Grain Millers*, 268 F.3d 456 (7th Cir. 2001), firmly observed that Title III of the ADA is not limited to physical locations and includes the web presence of businesses otherwise defined as public accommodations. *Id.* at 459. The language could not have been more forceful:

> The defendant asks us to interpret "public accommodation" literally, as denoting a physical site, such as a store or a hotel, but we have already rejected that interpretation. An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture

---

[9] Mr. Mazrui's claim for damages, filed when the 2016 Rule was still in effect, would remain regardless of the unreasonable 2020 regulation change. *See* 81 Fed. Reg. 31,375 (formerly codified at 45 C.F.R. § 92.301(b)).

> to a disabled person who enters the store. The site of the sale is irrelevant to
> Congress's goal of granting the disabled equal access to sellers of goods and
> services. What matters is that the good or service be offered to the public.

*Id.* (citations omitted); *see also Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999)

("The core meaning of [the public accommodation] provision, plainly enough, is that the owner or

operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other

facility (whether in physical space or in electronic space . . .), that is open to the public cannot

exclude disabled persons from entering the facility and, once in, from using the facility in the same

way that the nondisabled do.") (citation omitted)). The Seventh Circuit has expressly disapproved

authority in other circuits holding that a website must be tethered to a physical place to be a place

of public accommodation. *Morgan*, 268 F.3d at 459 (rejecting *Weyer v. Twentieth Century Fox

Film Corp.*, 198 F.3d 1104, 1114–15 (9th Cir. 2000); *Ford v. Schering-Plough Corp.*, 145 F.3d

601, 612 (3d Cir. 1998); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010–11 (6th Cir. 1997)

(en banc)). This is the unambiguous authority governing this case.

BCBSA consigns *Morgan* and *Doe* to a footnote (Def.'s Mot.at 19 n.10) and labels them

as dicta. Yet the district courts of the Seventh Circuit routinely treat these cases as controlling or,

at the least, guiding authority that must be respected. *See*, *e.g.*, *Wright v. Thread Experiment, LLC*,

No. 1:19-cv-01423-SEB-TAB, 2021 WL 243604, at *4 (S.D. Ind. Jan. 22, 2021) (noting the

Seventh Circuit's guidance in *Morgan* and *Doe*; holding "consistent with the Seventh Circuit's

directives that 'places of public accommodations' are not limited to physical spaces" that "Title

III of the ADA governs websites that otherwise satisfy the statutory definition of 'places of public

accommodation'"); *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141,

1155–56 (N.D. Ill. 2018) ("The court's *Morgan* dictum was not a passing thought, but rather an

explicit rejection of Uber's argument that a 'public accommodation' must be a physical site, made

while acknowledging the contrary holdings of other circuits," and thus while "not bound by *Morgan*'s considered dictum, I elect to follow it."). BCBSA invites this Court to be the first in the circuit to reject this explicit guidance about the application of the ADA to websites but offers no valid reason to do so.

In *Access Living*, the court expressly rejected BCBSA's strained reading of *Welsh v. Boy Scouts of America*, 993 F.2d 1267 (7th Cir. 1993). 351 F. Supp. 3d at 1156 n.13. (Def.'s Mot. at 19). *Welsh* held that "membership organizations that do not maintain a close connection to a structural facility" are not "public accommodations" under Title II of the Civil Rights Act. *Id.* (quoting *Welsh*, 993 F.2d at 1269). The court, though, found "the *Morgan* dictum more considered and persuasive than that in *Welsh*, where the court was principally concerned with another statute altogether." *Id.*; *accord Straw v. Am. Bar Ass'n*, 2015 WL 602836, at *6 (N.D. Ill. Feb. 11, 2015) (citing *Morgan*; "[T]hat the Bar Association may not offer its services at a 'physical site,' such as a store, does not mean that it cannot be a public accommodation for purposes of the ADA.").

The Court should also consider the evolving reality of Americans having primary contact with service providers online. *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019) ("Litigants (and courts) in ADA cases would do well to assess what's reasonable under the statute under current technological capabilities, not what was possible years ago"). Many customers routinely interact with banks, utilities, and insurers over the web, instead of in person or by mail, and in many cases, this is the only way to transact necessary business. With web sales gradually eclipsing in-person business—a trend that has only accelerated with COVID-19—to exclude websites would place a growing percentage of transactions beyond the reach of the ADA.[10] *See*

---

[10] *See* U.S. Dep't of Commerce, "Quarterly Retail E-Commerce Sales 3rd Quarter 2020" (Nov. 19, 2020) (web sales grew from 4.5% of retail in 2011 to 14.3% in Q3 of 2020),

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler Ass'n of New England*, 37 F.3d 12, 20 (1st Cir. 1994) (Limiting Title III to physical sites "would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.").

### B. INSURANCE COMPANIES ARE PUBLIC ACCOMMODATIONS.

BCBSA also makes a narrower argument: that even if a website is a place of public accommodation, an employee benefit plan is not a place of public accommodation because its services are not available to the public at large. For this proposition BCBSA cites *Morgan*, which states in full:

> What matters is that the good or service be offered to the public. The retirement plan was not offered to the public, however. It was negotiated between the employer and the representative of its employees. No one could walk in off the street and ask to become a plan participant. The plan was a private deal, not a public offering, and so the plaintiffs' public accommodations claim fails as well.

268 F.3d at 459 (citations omitted). In *Morgan*, the defendant was not an insurance company that deals with the public; rather, it was a retirement plan created solely to transact with a limited group. *Id.* at 457.

Employee welfare benefit plans like health insurance plans are definitionally limited to plan participants and beneficiaries. 29 U.S.C. § 1002(1).[11] Such benefits, as *Morgan* observes, are provided by a plan sponsor (employer or union) through a plan entity, rather than through a place of public accommodation. But BCBSA is a 501(c)(4) public welfare organization that deals widely

---

https://www.census.gov/retail/mrts/www/data/pdf/ec_current.pdf?#:~:text=E%2Dcommerce%20sales%20in%20the,the%20second%20quarter%20of%202020 (last visited Feb. 16, 2021).

[11] "Employee welfare benefit plan" is defined as: "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits."

with the public through its 36 health insurance companies. (FAC ¶ 16). According to Blue Cross Blue Shield's own website, 107 million people in all fifty states are covered by a Blue Cross policy. Blue Cross Blue Shield, *About Us: The Blue Cross Blue Shield System*, https://www.bcbs.com/about-us/the-blue-cross-blue-shield-system (last visited Feb. 16, 2021). In other words, BCBSA is not the limited-purpose entity contemplated in *Morgan*.

Nor does anything in the language of Title III or its regulations limit the term "public accommodation" to businesses that are open to the entire public, as long as they affect commerce.[12] It would make no sense to interpret the ADA to prohibit a business from discriminating against the general public but allow the business to discriminate against its customers. Insurance companies that issue policies to the public have long been held to be places of public accommodation, even if their core services are limited to paid policyholders or plan members. *See, e.g.*, *Doe*, 179 F.3d at 564; *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32–33 (2d Cir. 1999) (Title III regulates the sale of insurance policies in insurance offices); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1, 8–9 & n.7 (D.D.C. 1999) (collecting cases concluding that insurers are covered by Title III); 42 U.S.C. § 12181(7)(F) (listing insurance offices as a public accommodation); U.S. Dep't of Justice, *ADA Title III Technical Assistance Manual*, § III–3.11000, https://www.ada.gov/taman3.html ("Insurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts that they offer.") (last visited Feb. 16, 2021). The Seventh Circuit, while holding that the actuarial decisions behind insurance underwriting were not subject to the ADA, did not question that "an insurance company may not refuse to deal with disabled persons." *Doe*, 179 F.3d at 564.

---

[12] BCBSA concedes that there is publicly available information on fepblue.org. (Def.'s Mot. at 3).

Moreover, in *Morgan* and the string-cite of cases in BCBSA's brief (Def.'s Mot. at 15–17), the claims uniformly concerned coverage issues—the terms of the benefit plans—rather than, as here, *access to communications* from the insurer. This is the difference between what the plan may cover (held not to be within the scope of the ADA in *Doe*) and how the insurer transacts and communicates with customers. *See, e.g.*, *Morgan*, 268 F.3d at 457 (challenging amendment to plan that granted cost of living increase to early and normal retirees, but not disabled retirees).[13]

Under the reasoning of these cases, the four corners of the plan itself may not be subject to the ADA, but the insurance provider and the utilities (such as websites or apps) that give a participant access to the insurer that administers the plan and the information that it communicates are covered by Title III of the ADA and must not discriminate against individuals with disabilities. An insurer cannot cut off access to disabled customers, as alleged here, which is tantamount to "refus[ing] to deal with disabled persons." *Doe*, 179 F.3d at 564. For this same reason, *Weyer*, is distinguishable and communication access to the insurer constitutes a "place of public accommodation" under the WLAD. *Wash. State Commc'n Access Project v. Regal Cinemas, Inc.*, 293 P.3d 413, 422 (Wash. 2013) ("Washington courts may look to Title III of the [ADA] and interpretation of that provision as one source of guidance in adjudicating WLAD cases"); *Lewis v. Phan*, No. 19-0314-JCC, 2020 WL 885751, at *4 (W.D. Wash. Feb. 24, 2020) (same).

---

[13] *See, e.g.*, *Weyer v. 20th Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) (dispute "over terms of a contract that the insurer markets through an employer"); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1008 (6th Cir. 1997) ("longer benefits for employees who become disabled due to a physical illness than for those who become disabled due to a mental illness"); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 608 (3d Cir. 1998) ("disparity between benefits for mental and physical disabilities"); *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 237–38 (6th Cir. 2019) (failure to cover HIV drugs purchased through local pharmacy); *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1207 (9th Cir. Dec. 9, 2020) (same); *Kolling v. Blue Cross & Blue Shield of Michigan*, 318 F.3d 715, 715–16 (6th Cir. 2003) (coverage of speech therapy).

## VI.    PLAINTIFFS MAY SEEK MONETARY AND INJUNCTIVE RELIEF.

NFB concurs with BCBSA that it would not have standing on an associational basis to pursue compensatory damages on behalf of members. (Def.'s Mot. at 20–22). But courts have indisputably held that the NFB may seek prospective injunctive and declaratory relief for its members. *See Bone v. Univ. of N. Carolina Health Care Sys.*, No. 1:18CV994, 2019 WL 4393531, at *11 (M.D.N.C. Sept. 13, 2019) ("[T]he injunctive relief sought . . . would benefit members and constituents of [Plaintiff] NFB . . . without the need for participation of those other members."), *report and recommendation adopted*, No. 1:18CV994, 2020 WL 1062421 (M.D.N.C. Mar. 5, 2020); *Nat'l Fed'n of Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1192 (N.D. Cal. 2007) (concluding that the NFB has associational standing to pursue injunctive relief on behalf of members); *see also Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 603 (7th Cir. 1993) ("Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary.").

BCBSA contends that Mr. Mazrui has not alleged the predicate "deliberate indifference" for monetary relief under § 504 of the Rehabilitation Act. (Def.'s Mot. at 22–23). But Federal Rule of Civil Procedure 8 does not create a pleading standard for damages beyond what is necessary to establish standing. *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018). The Seventh Circuit holds that plaintiffs need not plead theories of relief or the facts underlying them. *See*, *e.g.*, *id.* (reversing ruling that plaintiff did not "adequately plead damages," noting that "Rule 8(a)(3) requires the plaintiff to identify the remedy sought, but it does not require detail about the nature of the plaintiff's injury"); *see also Alexander v. United States*, 721 F.3d 418, 424 (7th Cir. 2013) ("Rule 8 does not demand that a plaintiff prove . . .  facts (such as the motivations of [government agents]) that he has no way of knowing prior to discovery" (quoting Fed. R. Civ. P. 9(b) that "intent . . . may be alleged generally")). BCBSA's only authorities from this circuit

address this issue *after* the pleadings stage. *Lacy v. Cook Cty.*, 897 F.3d 847, 862–63 (7th Cir. 2018) (trial); *Zachary M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 202*, 829 F. Supp. 2d 649, 662 (N.D. Ill. 2011) (summary judgment).

Even if factual allegations of deliberate indifference were required, plaintiffs plead that BCBSA is and has "been aware of the access barriers that prevent blind federal employees, family members, former employees, retirees, and former spouses from accessing the BCBS FEP through fepblue.org" but "disregarded their obligations by failing to make the website[ ] and BCBSA's mobile app accessible." (FAC ¶ 35); *see also id.* ¶ 41 ("Despite having received notice that fepblue.org . . . [fails] to meet the applicable accessibility standards, Defendants have not ceased using fepblue.org . . . or remediated [its] inaccessibility."). These allegations are sufficient to survive a motion to dismiss. *See*, *e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 782 F.3d 331, 337 (7th Cir. 2015) ("Reed's allegations that the hospital, with knowledge of her disability, purposely denied her access to the computer that helps her communicate, permit an inference of intentional discrimination sufficient to support a claim for compensatory damages."); *Ayling v. Mem'l Health Sys.*, No. 19-cv-3091, 2019 WL 2234061, at *4 (C.D. Ill. May 23, 2019) (plaintiffs alleged "that they repeatedly informed Memorial personnel of the need for on-site interpreters and Memorial failed to provide such interpreters," which is "sufficient at the pleading stage").

Finally, BCBSA raises federal sovereign immunity as an alleged instrumentality of the federal government.[14] (Def.'s Mot. at 14). BCBSA's argument is meritless. Immunity is only available for *monetary* damages against the government, not the injunctive relief Plaintiffs seek. *See, e.g.*, *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga.*, No. 3:12–cv–1607–

---

[14] If BCBSA wishes to claim that it is an instrumentality of the federal government to avoid liability under the ADA, it should be required to comply with § 508 of the Rehabilitation Act.

O, 2014 WL 360291, at *7 (N.D. Tex. Feb. 3, 2014); *Pellicano, v. Blue Cross Blue Shield Ass'n*, No. 11–406, 2012 WL 1828027, at *5 n.5 (M.D. Pa. May 18, 2012). Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, waives sovereign immunity for all actions against the federal government for non-monetary relief, not just APA challenges. *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988). Courts have also recognized the availability of injunctive remedies under § 504 of the Rehabilitation Act. *See, e.g., Houck v. United States*, No. 17-CV-474-JPG, 2017 WL 2733905, at *6 (S.D. Ill. June 22, 2017) (recognizing injunctive relief against federal government under the Rehabilitation Act).

The limited cases where courts have extended sovereign immunity to private entities involved monetary claims that would cost the federal treasury money. *See Innova*, 2014 WL 360291, at *6); *Pellicano*, 2012 WL 1828027, at *5 n.5. For example, where a plaintiff sues over provision of health care services—expenses that are chargeable to the federal treasury by contract—sovereign immunity may apply. *See Innova*, 2014 WL 360291, at *6; *Pellicano*, 2012 WL 1828027, at *5 n.5 (claim for compensatory relief, such as pain and suffering, caused by failure to cover benefits). No such coverage claims are raised here, and there is no suggestion that the federal treasury would be chargeable for any monetary award.

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendant Blue Cross Blue Shield Association's Motion to Dismiss.


Dated: February 17, 2021               Respectfully submitted,

                                       */s/ Rachel M. Weisberg*
                                       Eve Hill (*pro hac vice*)
                                       ehill@browngold.com
                                       Sharon Krevor-Weisbaum (*pro hac vice*)
                                       skw@browngold.com

Monica R. Basche (*pro hac vice*)
mbasche@browngold.com
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Telephone: (410) 962-1030
Facsimile: (410) 385-0869


Barry C. Taylor
barryt@equipforequality.org
Paul W. Mollica
paulm@equipforequality.org
Rachel M. Weisberg
rachelw@equipforequality.org
EQUIP FOR EQUALITY
20 N. Michigan Avenue, Suite 300
Chicago, IL 60602
Telephone: (312) 341.0022
Facsimile: (312) 541.7544

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2021, I caused a copy of the foregoing Status Report to be filed electronically and that the document was served on all counsel of record by the Court's CM/ECF system.


/s/ *Rachel M. Weisberg*
Rachel M. Weisberg